```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF FLORIDA
 2                      CASE NO. 1:16-CR-20461-JEM-1-2


 3


 4    UNITED STATES OF AMERICA             Miami, Florida


 5                                         June 14, 2017
           vs.                             Wednesday

 6


 7    MILDREY DE LA CARIDAD                Scheduled 1:30 p.m.
      GONZALEZ AND MILKA                   1:41 p.m. to 2:28 p.m.
 8    YARLIN ALFARO
                                           Pages 1 - 40
 9
      ----------------------------------------------------------
10

                              SENTENCING HEARING
11


12                 BEFORE THE HONORABLE JOSE E. MARTINEZ
                       UNITED STATES DISTRICT JUDGE
13


14    APPEARANCES:


15

      FOR THE GOVERNMENT:      LISA H. MILLER, AUSA
16                             ALISON WHITNEY LEHR, AUSA
                               United States Attorney's Office
17                             Southern District - Criminal Division
                               99 N.E. 4th Street
18                             Miami, Florida  33132


19
      FOR THE DEFENDANTS:      MARC DAVID SEITLES, ESQ.
20                             Seitles & Litwin, P.A.
                               Courthouse Center - Penthouse One
21                             40 N.W. 3rd Street
                               Miami, Florida  33128

22


23    STENOGRAPHICALLY
      REPORTED BY:             GLENDA M. POWERS, RPR, CRR, FPR
24                             Official Court Reporter
                               United States District Court
25                             400 North Miami Avenue, Room 08S33
                               Miami, Florida 33128
```

1                    (Call to the order of the Court:)

2              COURTROOM DEPUTY:  All rise.  The United States

3    District Court in and for the Southern District of Florida is

4    now in session; the Honorable Jose E. Martinez presiding.

5              THE COURT:  Be seated, please.

6              COURTROOM DEPUTY:  Case 16-20461-criminal-Martinez.

7    United States of America versus Mildrey de la Caridad Gonzalez

8    and Milka Yarlin Alfaro.

9              Counsel, please state your appearances.

10             MS. MILLER:  Good afternoon, Your Honor.  Lisa Miller

11   for the United States, joined at counsel table by Adam Yaffe,

12   Special Agent Scott Mitchell from the FBI, and AUSA, Alison

13   Lehr.

14             THE COURT:  Good afternoon.

15             MR. SEITLES:  Good afternoon, Your Honor.  Marc Seitles

16   on behalf of Milka Alfaro and Mildrey Gonzalez, who are here,

17   present, before the Court, amongst family and friends.

18             THE COURT:  And they are using the interpreter; is that

19   correct?

20             MR. SEITLES:  Ms. Mildrey Gonzalez is using the

21   interpreters, Your Honor.

22             THE COURT:  Please swear the interpreters.

23             COURTROOM DEPUTY:  Do you solemnly swear or affirm that

24   you will interpret between the Court, counsel and witness the

25   issues before this Court, so help you God?

1             INTERPRETER WARGER:  I do.

2             INTERPRETER CHACON:  I do.

3             COURTROOM DEPUTY:  Please state both your names for the

4     record.

5             INTERPRETER CHACON:  Your Honor, good afternoon.

6     Andrea Chacon and Fiorella Warger, interpreters.

7             THE COURT:  Good afternoon, ladies.  All right.  We're

8     here on the sentencing from both of these ladies.

9             Could I get an appearance from probation?

10            THE PROBATION OFFICER:  Good afternoon, Your Honor.

11    Joseph Garcia from U.S. probation, along with Yolonda Rawl.

12            THE COURT:  Good afternoon.  All right.  We're here on

13    the sentencing.  I have reviewed the factual proffer and

14    written plea agreement in each case, the presentence

15    investigation in each case; note that there has been an

16    adjustment for obstruction of justice in each case and an

17    adjustment for acceptance of responsibility; note that there

18    have been no objections reported by the Government or the

19    defendant, and there is a second addendum to the presentence

20    investigation, the Government's sentencing memorandum and

21    objections to the PSI and the defendant's objections to the PSI

22    sentencing memorandum, on both cases, also requesting same BOP

23    location as to both of these defendants, and I've got a notice

24    of filing letters, and I've reviewed the letters.

25            I'm ready to proceed at this time.

1          I am -- I would note, Mr. Seitles, that I get a lot of

2   paper to read all the time.  It is not really pleasant for me

3   to have to read the same identical letter six times, using the

4   same language and telling me in exact terms -- let me see,

5   what's the exact wording -- "my niece" -- or whatever the other

6   relationship is -- "is a person of good moral character,

7   honest, transparent and loyal.  I realize that might seem hard

8   to believe, given the circumstances, but it's true,

9   nonetheless."

10         And then, "my niece is incredibly and truly remorseful,

11  is willing to do whatever it takes to make reparations,

12  financially and emotionally, if possible."

13         That phrase is in every single letter.  It really

14  sounds like you gave them a template and they didn't bother to

15  change anything.

16         MR. SEITLES:  That's incorrect, Your Honor.  I did not

17  give anybody a template.

18         THE COURT:  Well, somebody gave them a template,

19  because they're all identical.

20         MR. SEITLES:  That is --

21         THE COURT:  I guess it's possible that a group of

22  monkeys sitting in a room can write Shakespeare's works --

23         MR. SEITLES:  It does look like --

24         THE COURT:  -- but it isn't very likely.

25         MR. SEITLES:  It does look -- when I read them after

1    they were filed, it did look like they were very similar.

2           But no, I did not provide templates to anybody.

3           THE COURT:  Very, very similar, and I wish you had read

4    them before they were filed.

5           MR. SEITLES:  I normally do, Your Honor.  What was

6    provided to me was one letter, which I read, which was from

7    Mildrey's sister.

8           THE COURT:  That's all you needed to read.

9           MR. SEITLES:  And I saw that four letters were filed,

10   and then I --

11          THE COURT:  I think that's all you needed to read was

12   one letter.

13          MR. SEITLES:  That is correct, Your Honor.

14          THE COURT:  All right.

15          MR. SEITLES:  I saw the filing, I noticed that they

16   were all the same.  I had only reviewed one letter in my office

17   prior to the filing.  So I agree with Your Honor, they looked

18   very similar.

19          THE COURT:  And the other thing is, I'm sitting here

20   and I'm reading -- I believe it's your argument on the

21   sentencing on the mother, Mildrey; is that correct?

22          MR. SEITLES:  That's correct, Your Honor.

23          THE COURT:  Because, as you know, I read everything

24   that comes across my desk.  She's suffering from

25   osteoarthritis, which is not pleasant, I suffer from

1    osteoarthritis myself.  She's suffering and is a being treated

2    at FDC for hypermetropia and presbyopia.

3          Do you know what the treatment for hypermetropia is?

4    Glasses.  It's farsightedness.  I suspect that most

5    60-plus-year people are farsighted, and I suspect that they do

6    get treatment by buying reading glasses.

7          Come on, you know, that's -- that's -- I do look up

8    what they are, if I don't know what they are.  I am a

9    world-class hypochondriac, so I have a pretty good idea of what

10   most diseases are and probably have either suffered from them

11   or am about to if I find out what the symptoms are.

12         But they're treating her for hypermetropia.  What are

13   they doing for her?  They bought her a set of reading glasses.

14         Do you know what the other one is, presbyopia?  That's

15   what happens when you get over 40 years of age and your eyes

16   get a little bit hard, and so they're not as flexible, so that

17   you don't -- you can't -- farsightedness, again, it's the same

18   thing, the treatment for it is reading glasses.  You know,

19   whoever told you that wasted your time and mine.

20         But I digress.  Let's go forward.

21         What does the Government -- let me say --

22         MR. SEITLES:  Can I briefly respond to that,

23   Your Honor?

24         THE COURT:  Sure.

25         MR. SEITLES:  Thank you.  That was in the introductory

1    section of the objections.  Basically, I've listed all of their

2    treatments that she's receiving at FDC.

3           In the body of the sentencing memorandum goes through

4    the more serious conditions that she has, the hospitalizations

5    that she's gone under, the more severe treatments that she had

6    to receive recently, including a biopsy on her left breast,

7    where there's concerns that she has cancer.  So when I got into

8    the details, the weeds, so to speak, I did speak to the more

9    serious things.

10          THE COURT:  I understand, and I've read those, too.

11          MR. SEITLES:  But just in the introduction, I've listed

12   everything that she has.

13          THE COURT:  You've listed everything she's being

14   treated for.  How do you get treated for that?  I don't think

15   you get treated for farsightedness.  Like I said, the treatment

16   for farsightedness is glasses.  I doubt that FDC is handing out

17   reading glasses.  They could probably go to Walgreen's and get

18   them, but that's neither here, nor there.

19          Let's move on to -- both sides seem to agree that being

20   caught at the airport with 2.4 million dollars in currency is

21   an offshoot of the same crime; is that the Government's

22   position?

23          MS. MILLER:  That is, Your Honor, that it's part of the

24   same criminal activity and criminal spree that was ongoing.

25          THE COURT:  Is it part of the same criminal activity to

1    suborn a Customs & Border Patrol officer to assist them?

2         MS. MILLER:  Your Honor, the Government's position is

3    this --

4         THE COURT:  Isn't that kind of an extra added

5    attraction?

6         MS. MILLER:  Well, it's part of the same activity as

7    defined by the guidelines.  Factors the guidelines direct

8    courts to look to include proximity in time, similarity of

9    accomplices here.  It's the exact same accomplices, although,

10   you know, Mr. Alonso, the father of Ms. Alfaro's child was also

11   involved in the bulk cash events, but he did also have some

12   nexus to the fraud events, too.  He opened shell corporations,

13   and was not charged with that, but he was an accomplice in both

14   offenses.

15        THE COURT:  Is he the CBP officer?

16        MS. MILLER:  Yes, Your Honor.  So those factors

17   militate and construed --

18        THE COURT:  And the fact that the fraud was over a 10-

19   or 11-year period, whereas, this was after coming back to bring

20   money back into the United States for whatever purpose.

21        MS. MILLER:  The Government would not construe it's

22   after the fraud had been completed, though.  The fraud was

23   still ongoing at that time, and it was part of, arguably, the

24   money laundering events with which the defendants in this case

25   were also charged, concealing proceeds of the ongoing fraud was

1    part of the scheme charged in this indictment, in this case.

2         And the defendants had not withdrawn from the

3    conspiracy as of June 2016 and, in fact, the charged conspiracy

4    period in the superseding indictment does include June 2016.

5    So the Government's view is that the conspiracy had not, in

6    fact, ended with.

7         More significantly, the law doesn't require that it be

8    part of the same conspiracy or the events of conviction in

9    order to be considered relevant conduct.

10        Again, the Government views it most relevant that it's

11   part of the same string of criminal activity, and "criminal

12   activity" is the wording used in the guidelines, not "offensive

13   conviction."

14        THE COURT:  So I should not give them extra points for

15   that criminal activity, but I can consider it as relevant

16   conduct; is that what you're saying?

17        MS. MILLER:  That's correct, Your Honor.

18        THE COURT:  Okay.  Well, isn't that kind of like a six

19   to one and half dozen to another?  If I knock it off on one,

20   don't I have to kind of increase it on the other?

21        MS. MILLER:  You're not bound to increase it on the

22   other, whereas, the points awarded under criminal history would

23   necessarily increase the guidelines range -- advisory

24   guidelines range, but guidelines range --

25        THE COURT:  I am not bound to, but I am permitted to?

1          MS. MILLER:  Correct.

2          THE COURT:  All right.  I'll go along with that.

3     Everybody seems to think that, I'm not sure that it's so, but

4     I'm not sure that it makes an awful lot of difference, so I

5     will direct the probation office to revise the advisory

6     guideline provisions to reflect that change which results in

7     Milka Yarlin Alfaro having a total offense level of 34, with a

8     criminal history category of 1, which results in advisory

9     guideline provisions of 151 to 188 months, she's not eligible

10    for probation, supervised release of one to three years, a fine

11    of 35 to 350,000 and, of course, restitution remains in the

12    same amount, $22,906, 267.41.

13          In the case of Mildrey, results in total offense level

14    of 33, criminal history category of 1, which results in

15    advisory guideline provisions of 135 to 168 months.

16          Probation is not -- she's not eligible for probation,

17    supervised release of one to three years, a fine of 35 to

18    350,000, restitution of $2,906,267.41.

19          And, of course, in her case, a special assessment of

20    $200; in Milka's case, a special assessment of $100; is that;

21    correct?

22          Does everybody agree those are the applicable

23    guidelines?

24          MS. MILLER:  Yes, Your Honor.

25          MR. SEITLES:  Yes, Your Honor.

1          THE COURT:  Okay.  And let's go then.  What do you

2     think is a reasonable sentence?  Yes, ma'am?

3          MS. LEHR:  I wanted to remind the Court about the

4     forfeiture.  That would also be included.

5          THE COURT:  Okay.  What are we forfeiting?

6          MS. LEHR:  The items that you've identified in docket

7     entry 210, which we would ask be incorporated into the

8     judgment.

9          THE COURT:  Okay, yeah, I think I'd do that -- I think

10    I'd include it because I already did that.  It's not in the --

11    I have the joint and several restitution.  I do not have the

12    forfeiture.  You say it's docket entry 210?

13         MS. LEHR:  Yes, Your Honor.  All you need to do is

14    pronounce that and incorporate that into the judgment against

15    both the defendants.

16         THE COURT:  Okay, I will do that.  If I don't do it, I

17    will do it in my formal order, but I will announce it if I

18    don't go blank before then.  Okay?

19         MS. LEHR:  Thank you.

20         THE COURT:  All right.  Let me hear from the Government

21    as to what you believe is a fair sentence in both cases.

22         MS. MILLER:  The Government, consistent with the plea

23    agreement, is seeking low end of the guidelines range for each

24    defendant.

25              So, for Mildrey Gonzalez, that would yield a sentence

1   of 135 months' incarceration, and for Milka Alfaro 150 months

2   incarceration.

3           THE COURT:  151, you mean?

4           MS. MILLER:  Yes, Your Honor.

5           THE COURT:  Okay.

6           MS. MILLER:  I'll keep it brief because Your Honor's

7   familiar with the case, but it is, of course, a very serious

8   offense.  The duration was quite prolonged.  It involved

9   recruitment of multiple accomplices to serve, not only as

10  nominees, but also money launderers and patient recruiters,

11  involved a high level of coordination from start to end by each

12  defendant.

13          And it is particularly important in this community to

14  send a message of general deterrence because, as Your Honor is

15  aware, Medicare fraud remains an epidemic in Southern Florida.

16          So it is notable on this case, as well, that there was

17  obstructive conduct and not just the fraud.  There was effort

18  to locally conceal assets in front of Judge Goodman.

19          But that being said, the defendants have now fully

20  accepted that they did that.  They've taken responsibility, for

21  not only the significant fraud they participated in and, in

22  fact, spearheaded for years, they have acknowledged they

23  engaged in obstruction of justice by perjuring themselves in

24  front of Judge Goodman in a prior proceeding in this matter.

25          So it is a quite serious offense and there is a need

1    for deterrence.  With that being said, it is the Government's

2    opinion, they have accepted they did that, they have taken

3    responsibility for not only the significant fraud they

4    participated in, in fact, spearheaded for years, they've

5    acknowledged they engaged in obstruction of justice by

6    perjuring themselves in front of Judge Goodman in a prior

7    proceeding in this matter.

8         So it is a quite serious offense and there is a need

9    for deterrence.  With that being said, the Government's

10   position is that the guidelines do adequately reflect the

11   seriousness of the conduct and do adequately send a message of

12   deterrence, because each of them will be serving a term of more

13   than 10 years and, in particular, for Ms. Alfaro, 151 months.

14        The Government's view was that Ms. Alfaro was, albeit,

15   perhaps slightly more culpable than Ms. Gonzalez, but both were

16   very culpable in the creation and orchestration of this scheme.

17        The Government is happy to address any additional

18   questions the Court has, but like I said, based on the Court's

19   familiarity with the case --

20        THE COURT:  What's your position on concurrent or

21   consecutive with Judge Moore's case?

22        MS. MILLER:  The Government's position is that

23   concurrent sentences will be appropriate in this matter.

24        THE COURT:  So let me see if I understand this.  It

25   shouldn't be considered as anything to increase the guidelines,

1    but the sentence should be concurrent, also, so why were there

2    two separate cases and why did we bother?

3            MS. MILLER:  Well, I can't speak fully as to why it was

4    bothered, but there is many reasons why charging positions were

5    made as they were; in part, I think it was just timing, when

6    the bulk cash -- the time of day, the call coming in on the

7    intake.

8            But, in any event, they could have been charged

9    together in the same indictment, they just weren't, as a

10   practical matter here.

11           THE COURT:  Okay.  I'm not sure I go along with that,

12   but I've heard you, I appreciate it.  Thank you.

13           Yes, sir, please tell me what you believe is a fair

14   sentence and present whatever evidence you wish.

15           MR. SEITLES:  Thank you, Your Honor.

16           May I approach the podium?

17           THE COURT:  Of course.

18           MR. SEITLES:  Your Honor, let me address the Court's

19   first concern, because it's obvious that the Court has some

20   concerns regarding the bulk cash smuggling case.

21           So the reason -- or the answer to the Court's question

22   is the Government was still investigating and had not yet

23   charged the Medicare fraud case.

24           When the women came into the country, they were

25   stopped, obviously, at the airport.  The money was seized and,

1   obviously, a criminal complaint at that point was filed and

2   they were charged.  That ratcheted up very quickly an

3   indictment for the Medicare case.

4        So, I think, just the dynamics of what happened is the

5   reason why there were two cases.  I will tell you, Your Honor,

6   in response to the Court's concerns, I think one of the major

7   points -- and Your Honor has seen this case from start to

8   finish, where I have not -- and that is the following:

9        They were coming into this country with ledgers

10  voluntarily.  They could have stayed in the Dominican Republic.

11  There are other coconspirators in this case that remain in the

12  Dominican Republic, and that's because there was a dialogue

13  between their first lawyers -- not their second lawyers -- but

14  their first lawyers with the prosecutors in this case with the

15  hopes of resolution.

16       They did not have to come back.  They chose to come

17  back.  And as Judge Scola just noted, what I just read in the

18  Miami Herald -- was a defendant fugitive in $100 million dollar

19  fraud case, he varied downward -- without asking for a

20  variance, but given the Court's concerns here -- he varied

21  downward because he voluntarily came back from Cuba.

22       These two women voluntarily came back from the

23  Dominican Republic.  They came back with ledgers of information

24  that they were going to provide to the Government.  Then they

25  changed lawyers, and we all know what happened after that.

1            So, I'll just leave that without getting into more.

2    But I've now come into the case and within days we started

3    discussing resolution of this case, as opposed to a trial.   And

4    an explanation of those ledgers -- which is what they were

5    trying to do from the beginning of this case, which is

6    cooperate and throw themselves at the mercy of the Court.

7            Your Honor, the Government allowed me to argue for many

8    things today, but some things today, with respect to loss, with

9    respect to role, and both women have given me the authority to

10   waive those rights.

11           We are not going to be arguing that the loss amount was

12   less than 20 million when we could.   We are not going to be

13   arguing that Mildrey Gonzalez is less culpable, even given her

14   age and her health.   We're waiving that argument.

15           We're waiving the right to contest any assets in this

16   case.   We're not challenging it whatsoever.   They will have

17   nothing when they get out of federal prison.

18           They are waiving the right to challenge the obstruction

19   enhancement.   And I want to be clear about that, Your Honor.

20   There was a document, a financial affidavit that was drafted

21   and written and executed by them.

22           I know, from my practice, other than my screw up in not

23   reading other letters that I thought were not being filed, I

24   review everything.   I review every document when a client signs

25   it to make sure it's correct, to the extent that I can.

1    And as Your Honor knows, all of the properties at issue

2  were at issue at the very beginning of this case, all the

3  Government's desire to seize and forfeit these properties.  So

4  that was provided to the Court.  But remember, those properties

5  were not in their names.  So, technically, one could argue,

6  they were not their properties.

7    So those forms were executed and submitted, and I would

8  argue erroneously, but as I've indicated prior, we are going to

9  waive challenging that, Your Honor, and fall at the mercy of

10 the Court, and that's what both of these women have done in

11 every way, shape and form.

12    And as a result of it, they're facing a humongous

13 sentence compared to what they would have been facing had that

14 day come when they went to the airport and they would have

15 stayed with the first lawyer and worked all this out -- which

16 they were close to doing -- we wouldn't be in the situation we

17 are today.  But we are.

18    But most importantly, just to reiterate what I have

19 said, they are here standing at the mercy of the Court by

20 accepting everything, by fighting nothing, and by waiving their

21 rights in the plea agreement to fight enhancements that they

22 were permitted to fight.

23    Finally, with respect to their cooperation, and why

24 would Ms. Alfaro -- we beg this Court to give the low end of

25 the advisory guidelines of that very significant sentence of

1    151 months.  Since they've begun to cooperate and plead guilty

2    and resolve their case, since I've been representing them, they

3    have met with agents on eight or nine occasions.  They were

4    slated to testify in a trial before a doctor who was going to

5    trial.  They were debriefed by that particular prosecutor,

6    Christopher Clark, who was going to trial.  And once this

7    doctor learned of their cooperation, the week that the trial

8    was going to start, she folded and she pled.

9         Now, as the Court knows, there is no 5K before

10   Your Honor.  I was told the cooperation has to be complete.  I

11   advocated for it, but I defer, yet again, and as did the women

12   to the Government in this case in light of all the

13   circumstances.

14        And we understood that we could not get a 5K and we

15   cannot argue less than the 151 months for Ms. Alfaro, but when

16   the Court is considering other conduct and other concerns it

17   has, I would ask that the Court consider this fact when giving

18   151 months.

19        In addition to that, they cooperated in other

20   investigations that are ongoing.  They were slated,

21   potentially, to testify in a trial of the -- the Medicare fraud

22   case was several defendants -- at least one of which Mr. Rabon

23   was representing -- was discussing going to trial.

24        So their cooperation since they resolved their case has

25   been outstanding, and I think the case agent who's here at

1    counsel table would confirm the same.  They have met with

2    different prosecutors, with different agents, and everything

3    they've done so far has been truthful and has been complete and

4    has been reliable.  So I'd ask the Court to consider all of

5    that in determining what is the appropriate sentence in this

6    case.

7          And then, Your Honor, the sentences of the

8    coconspirators in this case were quite low.  They also did

9    cooperate, but they received sentences of 14 months and 22

10   months.

11         So, with respect to Ms. Alfaro, in light of all these

12   reasons that I've explained, in light of falling on the mercy

13   of the Court, I am respectfully requesting -- for very good

14   reasons, as I've tried to explain this afternoon -- a sentence

15   of 151 months.

16         With respect to Ms. Gonzalez, Your Honor, has already

17   sort of -- for lack of a better term -- not liked my arguments

18   or not thought they were very insightful.

19         THE COURT:  I haven't heard them yet.  I just told you

20   that two of those diseases are not really significant matters

21   to consider.

22         MR. SEITLES:  I understand the Court's point.  But I

23   will just explain the law and then I will cut to the chase as

24   to what I believe the facts that support a variance for

25   Ms. Gonzalez are.

1          So, Your Honor, 5H1.1 was amended in 2011 by the

2    Sentencing Commission and discussing that age can be a factor.

3    One of the reasons that the Commission did that is because of

4    the lower recidivism rates for elderly folks, and the fact that

5    10 percent of federal inmates are above the age of 50, only 10

6    percent.

7          And the Commission said that it is a reason -- age is a

8    reason to depart downward in a case where a defendant is

9    elderly and infirmed.  And I cited to several cases in support

10   of that proposition.  The United States versus Bray at

11   453 F.3d 1323, and that's an Eleventh Circuit case in 2006, and

12   it was a child pornography case where the court affirmed the

13   district court's variance from 151 months to 72 months because

14   of the age of the defendant, which was 64, and his medical

15   problems.

16         United States versus Hildebrand at 152 F.3d 756, Eighth

17   Circuit case from 1998, guideline range of 51 to 63 months.  In

18   that case, the Court moved all the way down to probation and

19   six months of home confinement because the defendant was 70

20   years old with medical problems.

21         And finally, the last case I cited, Your Honor, was the

22   United States versus Carter at 538 F.3d 784, Seventh Circuit,

23   2008, where the guidelines were 87 to 108 months, and the

24   defendant was sentenced to 24 months because of his age of 61

25   and the lack of recidivism that the district court sought.

1          I will be asking for no such --

2          THE COURT:  What was the crime in that case?

3          MR. SEITLES:  In my notes, I don't have what the crime

4    was, Your Honor.  I don't have any additional information on

5    that.

6          THE COURT:  Okay.  There's plenty of crimes that I

7    could see that being in your '50s and '60s is really good

8    evidence that they're not going to do it again.  An awful lot

9    of our Medicare fraud people are not spring chickens.  It

10   doesn't require a lot of physical effort to play with numbers.

11         MR. SEITLES:  Well, I can only speak to my experience,

12   Your Honor.  Ms. Gonzalez is probably -- of the hundreds of

13   Medicare defendants that I've represented, that's got to be in

14   the top 5 percent, in terms of age.

15         THE COURT:  That's probably true.

16         MR. SEITLES:  So I can only speak to my experience.

17   The other thing, Your Honor --

18         THE COURT:  But the fact that you said that you

19   represented hundreds of them is not good, because this is a

20   community that is rampant with Medicare fraud, and it's

21   frightening.

22         MR. SEITLES:  You know, obviously, I've heard this at

23   every one of these hundreds of sentencings and I've never

24   seemed to have the right response.

25         But I will say this, you know, there's a reason that

1    the federal government has so many assets that they use and

2    utilize and hire agents to bring down the prosecutor from the

3    Department of Justice, and it is to try to rid this problem.

4            But I don't think the individual defendant that faces

5    the music in front of a federal judge should be punished

6    because that federal judge sees five, six, seven, eight of

7    these defendants each week.  They're an individual defendant.

8    If anything, the Court should be happy that the government is

9    trying to weed out this problem.

10           THE COURT:  Doesn't 3553 say that one of the factors is

11   deterrent effect, if it's something that is endemic in the

12   community; if it's something that's a recurring problem?

13           MR. SEITLES:  It's one of the factors, Your Honor.

14           THE COURT:  Yeah.

15           MR. SEITLES:  I think it cuts the other way, because

16   with all of these sentences -- and many of them very high, by

17   Your Honor and others -- if it really had a general deterring

18   effect, we see the prosecutions going down; rather, we see the

19   prosecutions going up.

20           So it isn't just -- I think, personally, general

21   deterrence, while in theory, sounds wonderful, but the folks

22   that are in South Miami, Miami, whatever it is -- I'm not going

23   to generalize or to stereotype -- they're not watching the

24   sentences or reading the Miami Herald about what federal judges

25   are doing.

1          They're doing their things, stealing and taking money.

2     So I don't think it really has an effect.  I think,

3     theoretically, it sounds great, but I don't think it has the

4     effect that judges hope it would have.  And I think that's why

5     it's a factor.

6          And in reality, if this was another crime, why should

7     it be treated any differently?  The Government is working very

8     hard.  They're hiring prosecutors, hiring agents to deal with

9     the problem.

10          The individual defendant shouldn't be harmed any worse

11     under general deterrence concerns than another defendant in a

12     different type of case.  I think it, quite frankly, prejudices

13     that particular person who is being sentenced by Your Honor

14     and, quite frankly, by others in this district, as opposed to a

15     district judge in Ohio who sees very limited number of medicare

16     fraud cases.

17          With respect to the 5H1.4, that's yet another section

18     in the guidelines that speaks to physical condition.  And it

19     says:  And the Commission has stated, it may be relevant in

20     determining whether a departure's warranted.

21          So what I was saying just before I got into this is,

22     I'm not going to be asking for any dramatic variance,

23     Your Honor, whatsoever.  I think Your Honor would laugh at me,

24     and I'm just asking for consideration for the fact that her

25     time in prison is going to be, and has been, more significantly

1    difficult than the average defendant that goes to federal

2    prison.

3           And the cases that I've cited in support of that,

4    United States versus Hawthorne, 500 F.3d 813, Eighth Circuit,

5    in 2007, that medical care can be considered under the

6    guidelines, and it can be considered where somebody's serving a

7    more arduous sentence or is an infirmed defendant.

8           The United States very White, I think I just said that.

9           But United States versus Roush 570 F. Supp 1245, it's a

10   district case from Colorado, 2008, United States versus Hein,

11   403 F. Supp 2d 940, the Eastern District of Wisconsin.

12          So, legally, Your Honor, it would be on a sound basis

13   in which to find for a variance pursuant to the party's plea

14   agreement that I'm allowed to ask for it if the Court is

15   persuaded.

16          So what are Ms. Gonzalez's conditions?

17          Well, I've provided the Government with the medical

18   records prior to the hearing.  I did not file them because

19   oftentimes the judges will get annoyed that I'm filing big

20   cumbersome records, but I have them here if the Court wants to

21   see them.

22          But, essentially, Ms. Gonzalez has been hospitalized a

23   number of times.  She was diagnosed with diverticulitis in

24   2014.  She did two stints at Mount Sinai Hospital, resulting in

25   the doctor there recommended that she receive colon surgery.

1   She already had bowel surgery.  So that is sort of pending in

2   terms of issues that she's having with her colon and stuff.

3         Now, how do we know this is ongoing?  Well, it's part

4   of the record that I provided to the Government.  There was at

5   least two occasions since she's been in custody where she was

6   in extraordinary abdominal pain and suffering, and rode some

7   cop out from the FDC to be seen by a physician.  She had

8   bleeding and bloating and swelling and pain in her lower

9   abdomen.

10        She also suffers from chronic asthma and has been

11  hospitalized because of it in 2010.  She needed two blood

12  transfusions at that time and presently has two inhalers.

13        Your Honor, she suffers from hypertension.  She's a

14  high cardiac risk, osteopenia, which is low bone density, and

15  then the doctors that have seen her at FDC have noted in their

16  reports that she's a quote, chronic -- she has, quote, chronic

17  medical issues.

18        In addition to that, I think, Your Honor will have to

19  decide whether this is a relevant factor or not, but she has

20  psychological issues that she's had since she's been young.

21        She attempted suicide on two occasions when she was

22  young.  She has suffered from mental illness throughout her

23  life.  She suffers from depression and anxiety now, and the

24  proof of that is really the difference and distinguishing

25  characteristic between her and her daughter.

1          So when they were indicted in this case, there was a

2     cooperator from the Government that was housed in the same unit

3     as Mildrey and Milka.  And, unfortunately, at FDC, they have

4     not been able to cure this problem, but all of the women are

5     housed together.  There's no separatees, like there are for the

6     men.  So what they do is they send them on shifts to the

7     Special Housing Unit for 21 days.  So when one cooperating

8     defendant finishes, they come down and then the others go up.

9          And because when I came into the case it was such a

10    disaster, it took some time to try to work this out, quite

11    frankly.  They were begging me to do it, but it took time.

12         And then during that time, during the over 60-day

13    period, Mildrey Gonzalez was in the SHU, and I saw her.

14         Now, Ms. Alfaro was not happy.  Who's happy being in

15    solitary confinement?  But she was fine, she was dealing with

16    it like other female inmates that I've had represented and

17    other male inmates.

18         But Ms. Gonzalez was not; she was basically hysterical.

19    As you look at the reports from the BOP psychologist, she was

20    absolutely pounding the walls, crying incessantly, fearing

21    staying there forever.  She had a mental breakdown, for lack of

22    a better term.  Now she's out of SHU, so, Your Honor, that has

23    been resolved, but it just goes to show the difficulty that

24    she's had in custody.

25         Yes, she caused this, no question about it.

1        But that's not what the guidelines say, that's not what

2   the 3553 factors say; is that you also have to consider other

3   things.  Otherwise, why pass the statute.  Otherwise, why have

4   a guideline section if the Court can consider age and the Court

5   can consider health.  So she's had a difficult go of it.

6        With respect to her present medical issues, she's

7   taking over 13 medications.  I will note, Your Honor, some of

8   them are basic medications that both you and I would take on

9   that list, because I looked at it.  But some of them are not.

10        With respect to the most troubling condition that she's

11   been alerted to is an eight millimeter mass that's on her left

12   breast.  She's been tested multiple times.  And what is telling

13   about this is she actually refused, when she was in SHU, to

14   have further testing outside at Larkin Hospital or, quite

15   frankly, even in the SHU, where they were going to do a

16   mammogram.

17        And really, why that's telling to you, it shows you how

18   damaged psychologically she is, because anybody with basic

19   common sense would want to know, do I have cancer?  Do I not?

20   And she couldn't -- even her daughter couldn't convince her

21   that, mom, you have to get this taken care of.

22        Now, finally, when she was removed from SHU, when we

23   resolved the case, when she started to see some degree of hope

24   in her head, that she did agree and she went last month to

25   Larkin Hospital and she got the needle biopsy.  We do not have

1    the results, but, obviously, it was -- according to the medical

2    records -- a severe irregularity on the left breast so they've

3    got to do some additional testing.

4           Finally, Your Honor, in summary, I will ask for a

5    sentence of 120 months for Ms. Gonzalez.  It's a slight

6    variance.  It's not a significant variance.  It is still

7    10 years in federal prison for a woman that is suffering, both

8    physically and mentally.

9           And I strongly recommend, Your Honor, that the Court

10   goes along with the 151-month recommendations, in light of all

11   the factors that I've said, I hope I've addressed the Court's

12   concerns that Your Honor has brought to light early on and that

13   it is balanced by my arguments; mostly, because of how this

14   case was charged, I hope I responded to the Court's concerns in

15   that regard, and their significant cooperation.

16          But really more important than cooperation, the fact

17   that they have not fought about anything.  They have given up.

18   They have not argued any enhancement.  They have not argued for

19   anything when they had the right to do it, and I hope

20   Your Honor can respect that, can honor that, in a very

21   difficult case by giving the low end of the advisory guidelines

22   for Ms. Alfaro.

23          Thank you, Your Honor.

24          THE COURT:  All right.  But you just asked for lower

25   than the low end; right?

1          MR. SEITLES:  For Ms. Gonzalez, I asked for 120 months;

2     and for Ms. Alfaro, I asked for the low end.

3          THE COURT:  Doesn't paragraph two of the plea agreement

4     require you to -- or ask for a sentence within the guidelines?

5          MR. SEITLES:  No.  There's a carve-out exception in

6     Mildrey Gonzalez's plea agreement that allows the defense to

7     argue for a variance pursuant only to her health and age.

8          THE COURT:  I'm reading -- where is this carve-out

9     thing?  I'm reading paragraph two.

10          MR. SEITLES:  Your Honor, if I can just have a moment,

11     I'll show it to you.

12          THE COURT:  I'm reading paragraph two, and it says:

13     The United States and the defendant agree to recommend that the

14     sentencing guidelines should apply, pursuant to United States

15     -v- Booker, that the sentencing guidelines provide a fair and

16     just resolution based on the facts of this case and that no

17     upward or downward departure are appropriate, other than the

18     reduction for acceptance of responsibility.

19          That's at the bottom of page two and the top of page

20     three.

21          MR. SEITLES:  Your Honor, I believe, unfortunately,

22     just probation missed it.  It's a long plea agreement, as most

23     DOJ plea agreement's are.  But in paragraph 14, I'll read to

24     you what it says in the middle of the paragraph:

25          Further, the United States --

1          THE COURT:  Well, they didn't miss it.  I'm the one

2     that looked at it.  I guess I didn't get all the way to

3     paragraph 14.

4          MR. SEITLES:  Yes, Your Honor.  It's paragraph 14.  It

5     starts at the sentence, "further."  It goes through the fact

6     that we're -- though not binding on probation or the Court,

7     that there are no factors and circumstances.

8          But then there's the carve-out, three sentences down,

9     that goes on to say:

10          The Court's finding of any variance under Title 18,

11     United States Code 3553(a), other than possibly the defendant's

12     health and age, about which the parties agree the defendant may

13     present arguments at sentencing.

14          THE COURT:  Okay.

15          MS. MILLER:  Your Honor, to the extent it helps, the

16     plea agreement prohibits Mr. Seitles from arguing for a

17     departure, as opposed to a variance, which, limitedly, he was

18     allowed to argue for a variance, which the United States did

19     not concede as appropriate.

20          THE COURT:  Big deal.  I never did understand the

21     difference anyway, well, it doesn't matter.  Okay.

22          MR. SEITLES:  Thank you, Your Honor.

23          THE COURT:  All right.  Anything further from you

24     and/or the defendants?

25          MR. SEITLES:  No, Your Honor.  Thank you.

1          THE COURT:  I will do first Milka Yarlin Alfaro.

2          The Court has considered the statements of all the

3     parties, the presentence report, which contains the advisory

4     guidelines and the statutory factors as set forth in 18 USC

5     Section 3553(a).  The sentence will be imposed within and at

6     the low end of the advisory guideline range, as this will

7     provide sufficient punishment and deterrence.

8          It is the finding of the Court the defendant is not

9     able to pay a fine, however, restitution is mandatory.

10          It is the judgment of the Court the Defendant Milka

11     Yarlin Alfaro is committed to the Bureau of Prisons to be in

12     prison for 151 months.

13          This term shall be served consecutively to the sentence

14     imposed in docket 16-CR-20507-Moore.

15          It is ordered the defendant shall pay joint and several

16     restitution with her codefendants, Adriana de la Caridad, Luis

17     Enrique Luzardo and Mildrey de la Caridad Gonzalez, as well as

18     their coconspirators, in docket number 16-20444-criminal

19     Lenard, 16-20445-criminal Martinez, 16-20447-criminal Ungaro,

20     16-20449-criminal Middlebrooks, and 16-20492-criminal Williams

21     in the amount $22,906.267.41.

22          During the period of incarceration payment shall be

23     made as follows:  If the defendant earns wages in a federal

24     prisons industries Unicore job, than the defendant must pay 50

25     percent of wages earned toward the financial obligations

1    imposed by this judgment in a criminal case.

2         If the defendant does not work at a Unicore job, then

3    the defendant must pay a minimum of $25 per quarter toward the

4    financial obligations imposed in this order.

5         Upon release from incarceration, the defendant shall

6    pay restitution at the rate of 10 percent of monthly gross

7    earnings until such time as the Court may alter that payment

8    schedule in the interests of justice.

9         The U.S. Bureau of Prisons, U.S. Probation Office and

10   the U.S. Attorney's Office shall monitor the payment of

11   restitution and report to the Court any material change in the

12   defendant's ability to pay.

13        These payments do not preclude the Government and,

14   subsequently, the U.S. Probation Office from using any other

15   anticipated or unexpected financial gains, assets, or income of

16   the defendant to satisfy the restitution obligations.

17        The restitution shall be made payable to the Clerk,

18   United States Courts, forwarded to the U.S. Clerk's Office,

19   attention, financial section, 400 North Miami Avenue, Room

20   8N09, Miami, Florida, 33128.  The restitution will be forwarded

21   by the Clerk of the Court to the victim on the attached list.

22        I incorporate by reference the preliminary order of

23   forfeiture entered on March 8th, 2017, as docket entry 2010 as

24   if it were renewed at this time.

25        Upon release from imprisonment, the defendant shall be

1    placed on supervised release for a term of three years.

2         Within 72 hours of release from the custody of the

3    Bureau of Prisons, the defendant shall report in person to the

4    probation office in the district to which the defendant is

5    released.

6         While on supervised release, the defendant shall comply

7    with the mandatory and standard conditions of supervised

8    release, which include not committing any crimes, being

9    prohibited from possessing any firearm or other dangerous

10   device, not unlawfully possessing a controlled substance, and

11   cooperation in the collection of DNA.

12        The defendant shall also comply with the following

13   special conditions:  Substance abuse treatment, permissible

14   search, self-employment restriction, healthcare business

15   restriction, financial disclosure requirement, no new debt

16   restriction, and unpaid restitution, fines or special

17   assessments, as noted in part G of the presentence report.

18        It is further ordered the defendant shall pay

19   immediately to the United States a special assessment of $100.

20        The total sentence, 151 months BOP, $22,906,267.41

21   restitution, three years supervised release, and $100 special

22   assessment.

23        Now that sentence has been imposed, does the defendant

24   or his -- or her counsel object to the Court's finding of fact

25   or the manner in which sentence is pronounced?

1          MR. SEITLES:  No, Your Honor.  Thank you.

2          THE COURT:  Are there additional counts to be dismissed

3    as to Milka Yarlin Alfaro?

4          MS. MILLER:  Yes, Your Honor.  The Government moves to

5    dismiss the remainder of counts pending against Ms. Alfaro at

6    this time.

7          THE COURT:  All right.  Upon motion of the Government,

8    all remaining counts will be dismissed, as to this defendant,

9    Milka Yarlin Alfaro.

10         You have the right to appeal the sentence imposed.  Any

11   notice of appeal must be filed within 14 days after the entry

12   of the judgment.  If you're unable to pay the cost of an

13   appeal, you may apply for leave to appeal in the form of

14   pauperis.

15         And as I've said, the defendant's right, title and

16   interest to the property identified in the preliminary order of

17   forfeiture, which has been entered by the Court on March the

18   8th and is incorporated by reference herein, is hereby

19   forfeited.

20         Now, as far as Ms. --

21         MR. SEITLES:  Your Honor, if I may, just three

22   additional recommendations that we set forth in the --

23         THE COURT:  I will recommend that the Bureau of Prisons

24   review her for possible recommendation of residential drug and

25   alcohol program.

1          I will recommend that she be placed at FPC Alderson in

2     West Virginia, and that in any circumstance, if possible, that

3     she be in the same BOP location as her mother, Mildrey

4     Gonzalez, in this same case.

5          MR. SEITLES:  Thank you very much, Your Honor.

6          THE COURT:  All right.  Now, as far as Mildrey de la

7     Caridad Gonzalez, the Court has considered the statements of

8     all the parties, the presentence report, which contains

9     advisory guidelines and the statutory factors as set forth in

10    18 USC, Section 3553(a).

11         The sentence will be imposed within at the low end of

12    the advisory guideline range because this will provide

13    sufficient punishment and deterrence.

14         It is the finding of the Court the defendant is not

15    able to pay a fine, however, restitution is mandatory.

16         It is the judgment of the Court that the defendant

17    Mildrey de la Caridad Gonzalez is committed to the

18    Bureau of Prisons to be in prison for 135 months.

19         This term consists of 120 months as to Count 1 and 15

20    months as to Count 2, to be served consecutively to each other

21    and to the sentence imposed in docket 16-CR-20507-criminal

22    Moore.

23         It is ordered that the defendant shall pay joint and

24    several restitution with her codefendants Adriana de la

25    Caridad, Luis Enrique Luzardo and Milka Yarlin Alfaro, as well

1   as their coconspirators, in docket numbers 16-20444-criminal

2   Lenard, 16-20445-criminal Martinez, 16-20447-criminal Ungaro,

3   16-20449-criminal Middlebrooks and 16-20492-criminal Williams,

4   in the amount of $22,906,267.41.

5        During the period of incarceration payment shall be

6   made as follows:  If the defendant earns wages in a federal

7   prison industries Unicore job, then the defendant must pay 50

8   percent of wages earned toward the financial obligations

9   imposed by this judgment in a criminal case.

10       If the defendant does not work in a Unicore job, then

11   the defendant must pay a minimum of $25 per quarter toward the

12   financial obligations imposed in this order.

13       Upon release from incarceration, the defendant shall

14   pay restitution at the rate of 10 percent of monthly gross

15   earnings until such time as the Court may alter that payment

16   schedule in the interest of justice.

17       The U.S. Bureau of Prisons, U.S. Probation Office and

18   U.S. Attorney's Office shall monitor the payment of restitution

19   and report to the Court any material change in the defendant's

20   ability to pay.

21       These payments do not preclude the Government and

22   subsequently the U.S. Probation Office from using any other

23   anticipated or unexpected financial gains, assets, or income of

24   the defendant to satisfy the restitution obligations.

25       Restitution shall be made payable to the Clerk

1    United States Court, forwarded to the U.S. Clerk's Office,

2    attention, financial section, 400 North Miami Avenue, Room

3    8N09, Miami, Florida, 33128.  The restitution will be forwarded

4    by the Clerk of the Court to the victim on the attached list.

5         Upon release from imprisonment, the defendant shall be

6    placed on supervised release for a term of three years.

7         This term consists of three years as to each of

8    Counts 1 and 2, all such terms to run concurrently.

9         Within 72 hours of release from the custody of the

10   Bureau of Prisons, the defendant shall report in person to the

11   probation office in the district to which the defendant is

12   released.

13        While on supervised release, the defendant shall comply

14   with the mandatory and standard conditions of supervised

15   release, which include:  Not committing any crimes, prohibition

16   from possessing a firearm or other dangerous device, not

17   unlawfully possessing a controlled substance, and collection of

18   DNA.

19        The defendant shall also comply with the following

20   special conditions:  Substance abuse treatment, permissible

21   search, self-employment restriction, health care business

22   restriction, financial disclosure requirement, no new debt

23   restriction, and unpaid restitution, fines, or special

24   assessments as noted in part G of the presentence report.

25        It is further ordered the defendant shall pay

1    immediately to the United States a special assessment of $100

2    as to each of Counts 1 and 2, for a total of $200.

3         Total sentence, 135 months BOP, $22,906,267.41

4    restitution, three years supervised release, and $200 special

5    assessment.

6         Now that sentence has been imposed, does the defendant

7    or his counsel object to the Court's finding of fact or the

8    manner in which sentence was pronounced?

9         MR. SEITLES:  No, Your Honor.

10        I just wanted to clarify.  This is to run concurrent

11   with the prior sentence?

12        THE COURT:  No.  Consecutive.  Both of them are

13   consecutive.

14        You have the right to appeal the sentence imposed.  Any

15   notice of appeal must be filed within 14 days after the entry

16   of the judgment.  If you are unable to pay the costs for

17   appeal, you may apply for leave to appeal in form of pauperis.

18        The defendant's right, title and interest to the

19   property identified in the preliminary order of forfeiture

20   entered on March the 8th, 2017, which has been entered by the

21   Court and is incorporated by reference herein is hereby

22   forfeited.

23        I will recommend to the Bureau of Prisons that she be

24   screened for residential drug and alcohol program, that she

25   should be placed, if possible, at FPC Alderson in West

1   Virginia, and that she be confined at the same BOP as her

2   daughter, Milka Alfaro, in the same case.

3           I will also recommend that they screen her for any

4   health problems and please ensure that she is sent to an

5   appropriate medical facility to be treated before she is sent

6   to the prison that she's going to be residing at.

7           We'll be in recess on this matter.

8           MR. SEITLES:  Your Honor, I need to preserve my

9   objections.  If I misunderstood.  I understood that

10  Ms. Alfaro's sentence was concurrent to the other sentence

11  before Judge Moore, given all of our arguments, so obviously, I

12  have to preserve that objection.

13          THE COURT:  They're both consecutive, and certainly you

14  can preserve all of your objections.

15          Both sentences are consecutive.

16          MR. SEITLES:  And, Your Honor, with respect to any

17  further additional argument, which I really didn't make, I

18  mean, would Your Honor entertain as to why the concurrent

19  sentence is appropriate in this case?

20          THE COURT:  No.  I think I've heard it.  I think I'm

21  familiar with all of -- you've written it out and you've given

22  it to me and you had ample opportunity to argue it today.

23          MR. SEITLES:  Your Honor, it's -- because of how the

24  Government charged the case, that's going to result in them not

25  having a consecutive sentence.  I mean, that just can't be

1   right, Your Honor.  That just can't be right.

2        THE COURT:  If it's not right, the Eleventh Circuit has

3   never been bashful about telling me I'm wrong.  If I'm wrong,

4   I'm wrong.  I don't believe I am.

5        We'll be in recess.

6        (Proceedings concluded at 2:28 p.m.)

7

8                    C E R T I F I C A T E

9

10       I hereby certify that the foregoing is an

    accurate transcription of the proceedings in the

11  above-entitled matter.

12
    June 16th, 2016      /s/Glenda M. Powers
13  DATE                 GLENDA M. POWERS, RPR, CRR, FPR
                         United States District Court
14                       400 North Miami Avenue, 08S33
                         Miami, Florida 33128
15

16

17

18

19

20

21

22

23

24

25